IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 12-cv-01479-RBJ

NOEL KING,

    Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of Social Security,

    Defendant.

## ORDER

This matter is before the Court on review of the Commissioner's decision denying plaintiff Noel King's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Title II and Title XVI of the Social Security Act ("the Act"). Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision by this Court upon the filing of plaintiff's Reply Brief on January 24, 2013.

**Standard of Review**

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). A decision cannot be based on

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed.R.Civ.P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

substantial evidence if "it is overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988). Substantial evidence requires "more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2007). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

**Procedural History**

Mr. King originally applied for benefits in July 2006 stating an onset date of June 16, 2006. An administrative law judge (ALJ) held a hearing, and on August 1, 2008 the ALJ issued an opinion finding that Mr. King was not disabled within the meaning of the Social Security Act. The Appeals Council denied Mr. King's request for review, making the ALJ's opinion the final decision of the Commissioner. Mr. King appealed that decision to the district court. In an order dated August 8, 2011 Judge Babcock affirmed that order in part and remanded back to the Commissioner in part. Specifically, Judge Babcock affirmed the ALJ's determination that Mr. King did not meet the listing criteria of 20 CFR 404, Subpart P, Appendix 1, § 12.05 for mental retardation. However, Judge Babcock determined that substantial evidence did not support the ALJ's determination that Mr. King retained the residual functional capacity (RFC) to complete work that had a GED reasoning level of 2. Judge Babcock therefore remanded back to the Commissioner to revise the RFC and reassess what jobs are available to Mr. King with the revised RFC.

Mr. King filed subsequent claims for benefits in March 2010. Following the remand order, these claims were consolidated with Mr. King's previous application for benefits. In November 2011 the ALJ held another hearing and issued a decision in February 2012 finding

that Mr. King was not disabled within the meaning of the Act.  Mr. King's appeal of that opinion is now before this Court.

**Facts**

Noel King was born October 23, 1982 and was 23 years old at the time of his application for benefits.  Mr. King has a ninth grade education and can speak and communicate in English. He has held a variety of jobs in the past including bellman, fast food worker, furniture mover, and cook.  The ALJ determined that Mr. King suffers from the following severe impairments: (1) borderline intellectual functioning; (2) borderline personality disorder; (3) major depressive disorder; (4) degenerative disc disease of the lumbar and cervical spine; (5) bipolar disorder vs. schizophrenia; and (6) anxiety disorder.  Mr. King has seen a variety of providers to treat both his mental impairments and his physical impairments.

<u>Physical Impairments</u>

Mr. King first began suffering from back pain after sustaining a work injury in 2004. Those symptoms resolved themselves until Mr. King again injured his back at work in 2006. Following that injury Mr. King saw Dr. Timothy Sandell.  In his July 20, 2006 report, Dr. Sandell explained that Mr. King reported midline low back pain that radiates bilaterally and that can go down both legs and up the spine, causing secondary headaches.  R. 236.  After conducting a physical exam, Dr. Sandell reported that Mr. King was not in acute distress and showed no obvious spinal misalignment.  R. 238.  Dr. Sandell found tenderness in the paraspinal region upon palpitation, good motor strength without any focal motor weakness or muscle atrophy, and normal mobility.  R. 238.

On August 11, 2006 Dr. Sandell completed a second report where he noted that Mr. King's physical exam was unchanged.  R. 235.  Dr. Sandell recommended that Mr. King

continue with physical therapy and avoid impact activities. *Id*. Dr. Sandell also provided the following formal work restrictions: lifting a maximum of 20 pounds, doing frequent position changes, and minimizing bending. R. 235.

During this time, Mr. King also saw Dr. Thomas, his primary care physician, at Colorado Spring Health Partners. Mr. King saw Dr. Thomas for back pain, leg pain, shoulder pain, and follow up medication management. R. 607, 613, 628, 640, 643, 652. Reducing Mr. King's reliance on narcotic pain medications was a frequent topic. *See e.g.* R. 652, 669. At these appointments, Mr. King's gait was always normal. *Id.* Dr. Thomas often noted diffuse, non-focal mid and low back tenderness. R. 613, 777. At an appointment in January 2010 Dr. Thomas observed that there were no visible abnormalities on the lumbar spine, that all motor groups were within normal limits of strength and tone bilaterally, that all reflexes were within normal limits bilaterally, and that there was bilateral paraspinal muscle tenderness. R. 675.

In February 2010 Dr. Thomas completed an evaluation of Mr. King's work limitations. R. 779-80. Dr. Thomas opined that Mr. King could not work or volunteer but that he could attend school. R. 780. He determined that Mr. King could sometimes, meaning up to two hours continuously, sit, stand, or walk. R. 779. Further, he said that Mr. King could do sedentary work or volunteer activities up to four hours per day. R. 780. The evaluation was a check-the-box type form and Dr. Thomas did not provide additional narrative explanation.

In June 2010 Dr. Thomas noted that Mr. King had normal movement of all of his limbs. R. 654. In August 2010, Dr. Thomas noted that were no visible abnormalities on the lumbar spine and that Mr. King was not in acute distress. R. 645. On November 1, 2010 Dr. Thomas noted that Mr. King's "exam is not congruent with defined pathology," and therefore Dr. Thomas "would not tend to increase his pain medication dosing beyond the medication change

today." R. 634.  Dr. Thomas suggested that Mr. King seek the assistance of a pain management specialist, but it is noted in the records that Mr. King did not do this.  R. 628, 643.

In 2011 Mr. King was not able to get an appointment with Dr. Thomas, and he saw Dr. Hemsworth instead.  Dr. Hemsworth observed that "I fail to see any physical evidence on MRI or EMG for a cause of any significant pain and feel uncomfortable prescribing narcotics for this." R. 597.

Mental Impairments

In October 2006 Dr. Marten, Psy.D, completed a consultative evaluation of Mr. King. Dr. Marten found that Mr. King "displayed essentially appropriate behavior."  However, he reported a history of severe depression and including suicidal ideation and a plan, leading Dr. Marten to instruct Mr. King and his fiancé to have him volunatarily admitted to Penrose hospital. R. 265-66.  There is no follow-up as to whether that happened.  Dr. Marten also administered an IQ test using the Weschler Adult Intelligence Scale.  *Id.*  Dr. Marten found that Mr. King's overall verbal IQ was 77, his performance IQ was 69, and his full scale IQ was 71 placing him at the low end of the borderline range of intellectual functioning.  R. 267.  Mr. Marten assigned a GAF of 50 citing major depressive disorder, a mathematics disorder, personality disorder, and borderline intellectual functioning.  *Id.*

In 2006 Dr. Dyde, a state agency psychiatrist, completed a mental RFC of Mr. King. After reviewing the record, Dr. Dyde concluded that Mr. King suffered from major depression, borderline intellectual functioning, and a personality disorder.  R. 281-83.  He determined that Mr. King had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and mild difficulties in activities of daily living.  R. 288.  Dr. Dyde concluded that Mr. King's symptoms could interfere with completion of a normal workday

5

or workweek or cause inconsistent pace. R. 294. However, Dr. Dyde opined that if the work did not require more that simple instructions, ordinary work routines, and simple work decision making, Mr. King's limitations should not prevent the completion of a normal workday and workweek or a significantly reduced pace. *Id.*

In 2007 and 2008 Mr. King went to Pikes Peak Mental Health. In 2007, Yvonne Clark, a clinician at Pikes Peak Mental Health assigned Mr. King a Global Assessment of Functioning (GAF) score of 55. R. 324. In her report, Ms. Clark noted that Mr. King reported depressed mood, insomnia, difficulties concentrating, anxiety, nervousness, and paranoia, but at the time of intake he did not meet the criteria for a specific disorder. R. 324. In December 2007 Mr. King was given a GAF score of 62. R. 329. In that report, Dr. Scola determined that Mr. King was suffering from bipolar disorder and chronic pain syndrome. *Id.* In early January 2008, treatment notes reflect that Mr. King was suffering from anxiety, insomnia, depressed mood, poor appetite and obsessive ruminations. R. 328. He had suffered a significant psychosocial stressor, the death of a friend. *Id.* However, two weeks later treatment notes report that Seroquel was working well for Mr. King, that he was sleeping better, and his appetite was returning. R. 327.

In 2010 Dr. Jones completed a psychological evaluation of Mr. King. R. 541. Dr. Jones determined that Mr. King's GAF score was 60-65 in the past year and was 65 at the time of the appointment. R. 545. Dr. Jones acknowledged previous diagnosis of bipolar disorder or schizophrenia but did not find good historical or clinical evidence to support those diagnoses. *Id.* Instead, Dr. Jones found borderline personality disorder to be the principle diagnosis for Mr. King. *Id.* Dr. Jones found that Mr. King is a candidate for a dialectical behavioral program, and that such a program would be necessary in helping Mr. King deal with his difficulties in employment and interpersonal relationships. R. 546.

ALJ's Opinion

Using the five step sequential evaluation process required by the social security regulations, the ALJ determined that Mr. King is able to engage in substantial gainful activity and therefore does not meet the definition of disabled.

At step one the ALJ found that Mr. King has not engaged in substantial gainful activity since June 16, 2006, the alleged onset date of his disability. At step two of the process the ALJ found that Mr. King suffers from the following severe impairments: (1) borderline intellectual functioning; (2) borderline personality disorder; (3) major depressive disorder; (4) degenerative disc disease of the lumbar and cervical spine; (5) bipolar disorder vs. schizophrenia; and (6) anxiety disorder. At step three of the evaluation the ALJ determined that Mr. King does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. In completing the step three analysis, the ALJ considered whether Mr. King's impairments met or equaled the impairments described in sections 1.0, 12.03, 12.04, 12.06 and 12.08.

Before proceeding to step four, the ALJ determined that Mr. King had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that he is limited to unskilled work with an SVP of 2 or less and a GED level of 1, no dealing with the public, and minimal interaction with supervisors. In arriving at this RFC, the ALJ considered the medical evidence in the record as well as testimony from the hearings. The ALJ determined that because of many inconsistencies, Mr. King was not credible. R. 365. The ALJ found that "[i]n terms of the claimant's alleged pain and physical limitation, the evidence does not support the degree of limitation alleged," and that "[o]verall, the evidence does not support the debilitating level of mental symptoms reported by the claimant." R. 365, 368.

At step four the ALJ determined that Mr. King could not perform his past relevant work as a fast food worker, bellman, furniture mover, or cook. Finally, at step five, based on the testimony of a vocational expert, the ALJ found that based on Mr. King's age, education, work experience, and residual functional capacity, jobs existed in the national economy that he would be able to perform. Because jobs existed that he could perform, the ALJ determined that Mr. King was not disabled within the meaning of the act.

**Analysis**

Mr. King argues that the ALJ erred in the following ways in his opinion: (1) he did not explain why Mr. King did not meet the listing requirements in 20 CFR 404, Subpart P, Appendix 1, § 12.05- Mental Retardation at step three of the sequential evaluation process; (2) he did not properly weigh the medical opinions submitted; (3) he failed properly to determine Mr. King's RFC; and (4) he did not meet his burden at step five of the sequential evaluation process.

<u>Listing Requirements in § 12.05</u>

Mr. King argues that the ALJ failed to explain why he did not meet the listing requirements in 20 CFR 404, Subpart P, Appendix 1, § 12.05- Mental Retardation at step three of the five step sequential evaluation process. At step three the ALJ determines "whether the impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007) (quoting *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir. 1988)). If the impairment is listed it is conclusively presumed to be disabling, and the claimant is entitled to benefits. *Id.* "To show that an impairment or combination of impairments meets the requirements of a listing, a claimant must provide specific medical findings that support each of the various requisite criteria for the impairment. *Id.*

On review of an application with impairments similar to those alleged by Mr. King, an ALJ would generally be required to explain why the claimant did not meet the listing requirements of § 12.05. However, in this case, that issue was already decided by the ALJ in his previous order and affirmed by Judge Babcock. Under the law of the case doctrine, an "administrative agency, on remand from a court, [must] conform its further proceedings in the case to the principles set forth in the judicial decision . . . ." *Poppa v. Astrue*, 569 F.3d 1167, 1170 (10th Cir. 2009) (quoting *Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1201 (10th Cir.2007)). The law of the case doctrine only "applies to issues previously decided, either explicitly or by necessary implication." *Id.* In this case, Judge Babcock explicitly decided that the ALJ provided substantial evidence to support his decision that Mr. King did not meet the listing criteria for § 12.05. R. 423-24. Because this issue had already been decided by the ALJ and affirmed by Judge Babcock, it was not necessary for the ALJ to again explain why Mr. King does not meet the requirements of § 12.05.

<u>Medical Opinion Standards</u>

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing 20 C.F.R. § 401.1527(d)). Mr. King argues that the ALJ did not properly weigh the opinions of Dr. Thomas, Dr. Sandell, Dr. Dyde, Ms. Clark, Ms. Ridley, Dr. Marten, and Dr. Jones.

*Dr. Thomas*

Dr. Thomas was Mr. King's treating physician. Treating physicians' opinions are generally given controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). However, before assigning a treating physician's opinion controlling weight, "[a]n ALJ must

9

first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the answer to this question is 'no,' then the inquiry at this stage is complete." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting Watkins, 350 F.3d at 1300). Next, the ALJ must "confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.* (quoting *Watkins*, 350 F.3d at 1300). Further, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." *Watkins,* 350 F.3d at 1300 (quoting SSR 96–2p, 1996 WL 374188, at *2).

In his opinion, the ALJ determined that the work restrictions described by Dr. Thomas were not well-supported by medically acceptable clinical and laboratory diagnostic techniques. This determination is supported by substantial evidence in the record. The ALJ carefully explained the available objective medical evidence and concluded that "[t]hese mild findings are far less severe than the claimant's allegations of extreme pain would lead one to suspect." R. 365. As Dr. Hemsworth, Dr. Thomas's colleague explained, "I fail to see any physical evidence on MRI or EMG for a cause of any significant pain." R. 597. Dr. Thomas himself explained that Mr. King's "exam is not congruent with defined pathology" and therefore refused to increase the dosage of pain medication further. R.634. Based upon the objective medical evidence, it was reasonable for the ALJ to determine that Dr. Thomas's recommended work restrictions — no working or volunteering, no standing, sitting or walking for more than two hours at a time — were not supported.

Even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and should be weighted using the factors outlined in 20 C.F.R. §§ 404.1527 and 416.927. *Robinson v. Barnhart*, 366 F.3d at 1082 (quoting Watkins, 350 F.3d at 1300). The factors to be considered are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* (quoting *Watkins*, 350 F.3d at 1301). Although an ALJ should consider all of these factors, it is not necessary that he explicitly discuss every factor. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007). In deciding to afford Dr. Thomas's opinion little weight, the ALJ explained that Dr. Thomas was not a specialist in physical, occupational, or rehabilitative medicine; that he did not explain his opinion in any significant detail; and that it was not consistent with the objective medical evidence. R. 369. Because the ALJ addressed several of the factors in explaining his decision to accord Dr. Thomas's opinion little weight, he did not violate the medical opinions standards.

*Dr. Sandell*

The ALJ also afforded Dr. Sandell's opinion little weight. Dr. Sandell saw Mr. King only a few times for a brief period of time. R. 235-38. Because Dr. Sandell was not a "treating physician," his opinion was not entitled to the same deference that a treating physician's opinion receives. *Robinson*, 366 F.3d at 1084. The ALJ provided specific reasons for discounting Dr. Sandell's opinion: he only saw Mr. King a few times, he did not see Mr. King for 12 consecutive months after his alleged onset date, his opinion is inconsistent with a 2005 functional capacity exam, and his opinion is not well explained. According to the record, Dr. Sandell's second and

11

final report was completed in August 2006.  This was only two months after Mr. King's alleged onset date.  Because a claimant must have a disability lasting at least 12 months, I agree with the ALJ that this report is not very helpful.  The ALJ properly applied the factors in considering what weight to assign Dr. Sandell's opinion, and his decision is supported by substantial evidence.  R. 235.

*Dr. Dyde*

Dr. Dyde is a state agency psychiatrist who reviewed the file and rendered an opinion. The ALJ accorded Dr. Dyde's opinion great weight.  Generally, "the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1527(d)(1), (2) and 416.927(1), (2)).  If an ALJ decides to accord a non-examining physician great weight, he must provide specific reasons for doing so.  *See id.*  In his opinion, the ALJ relied on the factors described in 20 C.F.R. §§ 404.1527 and 416.927.  The ALJ found that Dr. Dyde completed a thorough review of the record, and that his findings were consistent with the record as a whole. R. 370.  He also found that Dr. Dyde was a highly qualified physician and psychologist with expertise in evaluation of medical issues in disability claims.  *Id.*  Further, Mr. King did not identify a treating psychologist whose opinion satisfies the criteria for controlling weight that the ALJ should have relied on instead.  Because the ALJ opinion provided specific reasons for assigning great weight to Dr. Dyde's evaluation, it does not violate the medical opinion standards.

*Ms. Clark and Ms. Ridley*

Next, Mr. King argues that the ALJ failed "to adequately recognize the extent to which Ms. Clark and Ridley's opinions were consistent and supportable by the bulk of the GAF scores,

which the ALJ dismissed." Pl.'s Br. 23. Ms. Clark is a clinician at Pikes Peak Mental Health Center, and Ms. Ridley is a Psychiatric and Mental Health Nurse Practitioner. Under the social security regulations, neither of these health care professionals is an acceptable medical source. SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). Social Security Ruling 06-03P states that, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. It also states that "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." *Id.* at *5. The ALJ considered the opinions from each of these professionals and provided detailed explanations as to why their opinions were given little weight. R. 370-71. Because the ALJ considered the particular facts of this case and then determined that these opinions were entitled to little weight, he did not violate the medical opinion standards.

### *Dr. Marten and Dr. Jones*

Finally, Mr. King argues that the ALJ did not clarify what weight he assigned to Drs. Marten and Jones. Mr. King raised a similar issue in his first appeal to Judge Babcock, arguing that the ALJ did not specify the weight given to Drs. Dyde and Marten and therefore the court could not conduct a meaningful review. R. 425. Judge Babcock held that the ALJ's opinion was adequate. *Id.* Judge Babcock explained,

> "[c]onsistent with SSR 96-8p, the ALJ's decision included a narrative discussion of all the evidence he considered in determining Plaintiff's RFC including the opinions of Drs. Dyde and Marten. Furthermore, the RFC that the ALJ assessed for Plaintiff was largely consistent with the opinions of Drs. Dyde and Marten, demonstrating that the ALJ attached some weight to these opinions which are not contradicted by other reliable evidence in the record."

*Id.* Similarly, in this opinion, the ALJ completed a narrative explanation of both Dr. Marten's and Dr. Jones's evaluation of Mr. King. The RFC that the ALJ assigned was mostly consistent with the opinions of Dr. Jones and Dr. Marten. Therefore, like Judge Babcock, this Court believes that this shows that the ALJ attached some weight to these doctors' opinions. Because the ALJ provided a detailed narrative, it is possible for this Court to meaningfully review Mr. King's RFC. Accordingly, the ALJ did not violate the medical opinions standards in his discussion of Dr. Jones's and Dr. Marten's opinions.

RFC

Next, Mr. King argues that the ALJ did not properly assess his RFC. Specifically Mr. King argues: (1) that the ALJ failed to consider the combined impact of all of Mr. King's impairments; (2) that he did not adopt all of Dr. Dyde's recommendations, (3) that he failed to include a limitation on contact with co-workers, and (4) that he used the wrong standard in discussing Mr. King's total disability.

First, I disagree that the ALJ failed to consider the combined impact of all of Mr. King's impairments. Mr. King points to his headaches, panic attacks, myofascial pain syndrome, and chronic pain disorder as impairments that the ALJ failed to consider. The ALJ explicitly discussed Mr. King's headaches and determined that "the headaches would not limit the claimant's ability to perform the range of light work found above." R. 367. The ALJ also addressed Mr. King's panic attacks concluding that "the record is utterly devoid of corroboration of the severity and frequency of panic attacks alleged by the claimant." R. 368. The ALJ carefully explained why he determined that Mr. King was not credible. R. 365-367. The lack of evidence in the record to corroborate Mr. King's reports of panic attacks combined with the

14

finding that he is not credible substantially supports the ALJ's decision not to include additional limitations in the RFC because of panic attacks.

The ALJ went into significant detail discussing the objective and subjective evidence of pain that Mr. King experiences. After considering all of the evidence of pain suffered by the claimant, the ALJ determined that "these findings are not consistent with the claimant's allegations, but do appear consistent with light work activity." R. 366. Thus, is limiting his RFC to light work, the ALJ considered the pain that Mr. King was experiencing including myofascial pain syndrome and chronic pain disorder. Because the ALJ considered all of Mr. King's impairments, Mr. King's first argument is without merit.

Next, Mr. King argues that the ALJ failed to adopt all of Dr. Dyde's restrictions. In the mental RFC that Dr. Dyde completed, he found that Mr. King had the following moderate limitations: the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods of time, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 292-93. Dr. Dyde did not find any areas in which Mr. King was markedly limited. *Id.* Further, Dr. Dyde explained that "when work does not require more than simple instructions, ordinary routines and simple work decision making, limitations of attendance and pace will not prevent the completion of a normal workday/workweek or significantly reduce[d] pace." R. 292. The ALJ's RFC — limiting Mr. King to unskilled work with an SVP of two or less and a GED level of 1 only, no dealing with the general public, and minimal interaction with supervisors — is consistent with these limitations. Accordingly, I can find no error in the use of Dr. Dyde's opinion.

Third, Mr. King argues that the ALJ erred in not including a limitation on Mr. King's contact with co-workers. To support his argument, Mr. King cites to the ALJ's opinion where he recognizes Mr. King's occasional paranoid ideations. Pl.'s Br. 26. However, Mr. King fails to include the next sentence from the ALJ which states, "his symptoms of paranoia and hallucinations appear to respond fairly well to medication management." R. 368. Thus, although the ALJ acknowledged the Mr. King struggled with paranoia, he also found that Mr. King was able to control these paranoid ideations with medication. While a limit on interactions with co-workers would have been reasonable, Mr. King does not provide support for his assertion that this was a necessary limitation.

Finally, Mr. King argues that the ALJ was incorrect in concluding that "the evidence does not support a total mental inability to sustain work activity." Pl.'s Br. 27, R. 368. Mr. King argues that this sentence suggests that the ALJ was applying a standard that "infers a level of mental disability requiring in-home institutional care," rather than the proper standard of whether Mr. King was able to sustain full time work. Pl.'s Br. 27. First, the proper standard for determining disability is the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(a). The ALJ explained that this was the standard for determining disability and then described the five step process required in making this determination. R. 360-61. The ALJ's conclusion that "the evidence does not support a total mental inability to sustain work activity" in no way suggests that the ALJ did not apply the correct standard and instead required Mr. King to be "catatonic." Accordingly this argument is without merit.

<u>The Commissioner's Burden at Step Five</u>

Finally, Mr. King argues that the Commissioner did not meet her burden at step five of the sequential evaluation process because errors in the evaluation of medical opinions or of the RFC rendered the step-five evaluation invalid. However, as discussed above, I have determined that the ALJ did not err in weighing the medical opinions and arriving at an RFC.

At step five of the evaluation process the burden is on the Commissioner to show that jobs exist in the national economy that the claimant can perform. *Williams v. Bowen*, 844 F.2d 748, 760 (10th Cir. 1988). To establish that jobs exist in the national economy, the Commissioner can rely on opinions by vocational experts based on hypothetical inquiries. However, "such inquiries must include all (and only) those impairments borne out by the evidentiary record." *Evans v. Chater*, 55 F.3d 530, 531 (10th Cir. 1995). The ALJ formulated a hypothetical that included all of the restrictions in the RFC. R. 393-94. Based on that hypothetical, the vocational expert determined that there were jobs available in the national economy that Mr. King could perform. *Id.* Therefore, the Commissioner met her burden at step five.

After carefully examining the record, briefing from the parties, and the ALJ's opinion, I find that the Commissioner's decision applies the correct legal standards and is supported by substantial evidence.

**Order**

For the foregoing reasons, the Commissioner's decision is AFFIRMED.

DATED this 1st day of July, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge